United States District Court
Southern District of Texas

**ENTERED**

March 16, 2017

David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| AMID, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-16-1137 |
| | § | |
| MEDIC ALERT FOUNDATION UNITED | § | |
| STATES, INC., d/b/a Medic Alert Foundation, | § | |
| and JUSTIN NOLAND, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION SETTING OUT FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

1

Table of Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.     The Evidence in the Record  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        B.     The Parties and the Products  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        C.     The Events Leading to this Litigation . . . . . . . . . . . . . . . . . . . . . . 8

II.     The Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        A.     Preliminary Injunctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        B.     The Lanham Act  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        C.`    The Copyright Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III.    Findings of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        A.     The Trade-Dress Infringement . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
               1.    Inherent Distinctiveness . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
               2.    Secondary Meaning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
                     a.    The Length and Manner of Using the Trade Dress   . . . . 32
                     b.    The Sales Volume  . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
                     c.    The Amount and Manner of Advertising . . . . . . . . . . . . 34
                     d.    The Nature of the Use of the Mark or Trade Dress in
                           Newspapers and Magazines . . . . . . . . . . . . . . . . . . . . . 35
                     e.    The Consumer-Survey Evidence . . . . . . . . . . . . . . . . . 35
                     f.    Direct Consumer Testimony  . . . . . . . . . . . . . . . . . . . . 42
                     g.    MedicAlert's Intent in Selecting the Trade Dress it Used
                           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
                     h.    Weighing the Factors . . . . . . . . . . . . . . . . . . . . . . . . . 44
               3.    Functionality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
               4.    Summary on AMID's Claim of Protected Trade Dress . . . . . . . 48
               5.    An Additional Problem: Injunctive Relief and Irreparable Harm
                     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

        B.     The Copyright-Infringement Claim . . . . . . . . . . . . . . . . . . . . . . . . 52

IV.     The Motion to Dismiss  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

V.      Conclusions of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

VI.     Conclusion and Order Setting Hearing . . . .  . . . . . . . . . . . . . . . . . . . . . . . 60

2

## Introduction

The plaintiff, American Medical ID (AMID), wants to stop the defendant, MedicAlert Foundation United States, from using marketing methods and materials that AMID claims infringe its trade dress and copyright.  (Docket Entry No. 5).   Both AMID and MedicAlert make medical-identification jewelry.   AMID's jewelry displays the wearer's critical medical information, so emergency personnel can see the medical conditions on the jewelry itself; MedicAlert's jewelry displays a toll-free phone number that emergency personnel can call to obtain information on the wearer's medical conditions.

Both companies market their medical-identification products in part by sending unsolicited mass-mailed countertop displays with tear-off pads attached to doctors' offices.  These displays are intended to be placed in doctors' waiting rooms or lobbies, where patients gather or pass through. Both companies include a letter to each doctor's office explaining what to do with the enclosed display and the importance of patients wearing medical-identification jewelry.  AMID copyrighted its letter.

AMID asserts that its unsolicited mailings of countertop easel displays is a protected marketing method and that the countertop display is protected as trade dress that MedicAlert is infringing.  AMID also alleges that MedicAlert is infringing its copyrighted letter.

This dispute began after a former AMID marketing manager, codefendant Justin Noland, resigned from AMID and went to work at MedicAlert.   MedicAlert had sold its medical-identification jewelry since the 1950s, but it had not mailed unsolicited countertop displays to doctors' offices for the prior six years.   MedicAlert resumed the mailings after Noland began working there.  AMID alleges that Noland misappropriated the marketing methods and displays and

improperly provided them to MedicAlert.

AMID moves for a preliminary injunction on its trade-dress infringement and copyright-infringement claims.  (Docket Entry No. 5).  AMID seeks to enjoin MedicAlert's use of the unsolicited mass-mailings as a marketing method; use of the packaging that contains the displays; and use of the displays themselves.  It also seeks to enjoin MedicAlert's use of the letter enclosed in those packages that contain the displays.  In a three-day evidentiary hearing held in October 2016, the court received testimony from witnesses, admitted exhibits, and heard oral argument from counsel.  MedicAlert has also moved to dismiss AMID's Texas common-law unfair-competition claim, arguing that the Texas Uniform Trade Secrets Act preempts it because it is based on alleged trade-secret misappropriation.  (Docket Entry No. 24).

Both sides have provided the court with excellent briefs on the legal issues and thorough submissions substantiating their factual claims and defenses.  Based on the pleadings, the application for preliminary injunction and the response, the motion to dismiss and the response, the prehearing briefs and submissions, the testimony, the arguments, the exhibits presented at the three-day hearing, the posthearing briefs and submissions, and the applicable law, the court enters the following findings of fact and conclusions of law.  For the reasons set out in detail below, the court finds and concludes that:

- AMID has not shown that it is likely to succeed in establishing a protected trade dress in the marketing materials because the trade dress is not inherently distinctive, has not acquired secondary meaning, and is functional, and therefore AMID has not demonstrated a substantial likelihood of success on its trade-dress infringement claim under the Lanham Act;

4

- AMID has shown a substantial likelihood of success on the merits of its copyright-infringement claim but has not shown that the infringement poses a substantial threat of irreparable injury; and

- AMID's common-law unfair-competition tort claim is not preempted because AMID could recover on the tort claim without proving that the information is protected as a trade secret.

AMID's preliminary-injunction application is denied,   (Docket Entry No. 5), and MedicAlert's motion to dismiss is denied, (Docket Entry No. 24).  This case is set for a status conference on **April 24, 2017 at 3:00 p.m.**

I.      **Procedural Background**

A.       **The Evidence in the Record**

AMID filed this suit in April 2016 and moved for a preliminary injunction.  (Docket Entry Nos. 1, 5).  AMID submitted affidavits from Rick Russell, AMID's founder and Chief Executive Officer, and Angela Flowers, AMID's director of strategic accounts and direct marketing.[1]  AMID also submitted photographs of its displays showing the asserted trade dress; the letter that accompanies the displays, with its copyright registration; side-by-side photographs of AMID's and MedicAlert's countertop displays and letters; a MedicAlert press release; and a chart summarizing

---

[1]  MedicAlert moves to strike the affidavits in AMID's posthearing findings of fact and conclusions of law because the affiants testified at the preliminary-injunction hearing.  The court denies the motion to strike.  *See Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993) ("[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence. Thus, the district court can accept evidence in the form of deposition transcripts and affidavits."); *accord ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 682 (N.D. Tex. 2015).  The affidavits are given limited weight, however, because the witnesses testified and were cross-examined at the hearing.

the results of a telephone survey AMID conducted to detect evidence of confusion by doctors' office staff.  (Docket Entry No. 5, Exs. 1–20).

MedicAlert responded with a brief, (Docket Entry No. 14), and affidavits from David Leslie, MedicAlert's president and CEO; Melody Howard, MedicAlert's vice-president of call-center operations; and Justin Noland, MedicAlert's senior director of marketing.  MedicAlert also submitted newspaper articles about the company and its history; photographs of marketing displays MedicAlert has used over the years; written communications between AMID and MedicAlert; side-by-side photographs of AMID's and MedicAlert's displays; a patent registration for a countertop marketing easel display; photographs of various displays AMID has used; MedicAlert's advertising-style guide; a screenshot of a Google search for "medical ids"; photographs of the letters both AMID and MedicAlert sent with their displays; and a photograph of another display, sent by a different medical-identification product marketer, also using an easel display with a tear-off pad attached. (Docket Entry No. 14, Exs. 1–23).

In the evidentiary hearing in October 2016, (Docket Entry Nos. 40–42), the witnesses included David Leslie and Melody Howard from MedicAlert; Rick Russell and Angela Flowers from AMID; Sarah Butler, AMID's survey expert; and Dr. Gary Ford, MedicAlert's survey expert. The court also admitted exhibits.[2]

The court analyzes the evidence under the applicable law.

### B.    The Parties and the Products

---

[2]  The exhibits included: photographs of displays MedicAlert and AMID have used in the past; correspondence between the two companies; photographs of AMID's displays in doctors' offices; screenshots of AMID's and MedicAlert's websites; expert reports; results of Google searches; AMID's letters sent in the packages mailing the displays to doctors' offices; Justin Noland's employment agreement with AMID; side-by-side photographs of AMID's and MedicAlert's countertop displays and letters;  a MedicAlert press release; and a chart summarizing the results of AMID's telephone survey.

American Medical ID, or AMID, began in 1994. (Tr. 3:7). It sells medical identification bracelets and tags with the wearer's important medical information printed on the jewelry. (Docket Entry No. 5 at ¶ 3; Pl. Ex. 5; Tr. 1:210–211). MedicAlert Foundation is a § 501(c)(3) charitable nonprofit organization founded in 1956. (Tr. 1:87). Like AMID, MedicAlert sells medical-identification jewelry. (*Id.* at 1:204–206). MedicAlert's jewelry displays a toll-free phone number with the wearer's identification number. (*Id.*). MedicAlert maintains medical information for individuals who subscribe to its service and provides its subscribers with medical-identification jewelry with a toll-free number and the wearer's identification number. MedicAlert operates call centers with medically trained staff who answer the toll-free number and provide the subscriber's medical information to emergency medical or other medical professionals who call. (*Id.* at 1:203–205). AMID sells its jewelry to patients or their families who place orders and puts the wearer's important medical conditions on the jewelry. (*Id.* at 1:210–211).

Justin Noland began working at AMID in March 2011 in the marketing group. He became brand manager in 2012. (*Id.* at 1:259). Noland learned about AMID's unsolicited mass-mailings to doctors' offices during weekly marketing meetings. (*Id.* at 1:259–60, 1:272–75). In one quarter, Noland himself worked on the displays sent to doctors' offices and was responsible for the artwork on the attached tear-off order forms. (*Id.* at 1:261–62). According to AMID, Noland learned about the vendors AMID worked with, the specialities of the doctors who received the AMID displays, and generally about the "entire direct-marketing program." (*Id.* at 1:263–64, 1:273–75).

Noland left AMID in May 2014 and began working at MedicAlert in June 2014. (*Id.* at 1:145, 2:7–9, 3:27). AMID contends that Noland violated his employment agreement, which

included a noncompete provision.[3]  (Pl. Ex. 1).  AMID employees did not know that Noland was working at MedicAlert until about a year after he left AMID.  (Tr. 2:8, 3:27).  In late June 2015, Angela Flowers, AMID's director of strategic accounts and direct marketing, learned through a text message sent to a coworker that Noland was working at MedicAlert.  (*Id.* at 2:8).

### C.    The Events Leading to this Litigation

In June 2015, AMID learned that MedicAlert was mailing to doctors' offices a display that AMID asserts is among those that infringe its protectable trade dress, with the letter that AMID asserts infringes its copyright. (*Id.* at 2:11).  Angela Flowers checked MedicAlert's website and found an "order displays" section.  (*Id.*).  When Rick Russell viewed the website, he became concerned about MedicAlert's "strikingly similar display." (Tr. 3:27–28, 2:11; Pl. Ex. 30).  Russell told Flowers to continue monitoring the MedicAlert website, following AMID's practice of monitoring competitors' websites. (Tr. 3:88, 2:9–10).  Around this time, Russell asked Flowers to contact AMID's outside counsel, Wayne Isaacs.  (*Id.* at 2:36–37, 2:39, 3:73).  AMID had used him in prior trademark matters.  (*Id.*).

On July 6, 2015, Russell sent an email to MedicAlert's board chair, Barton Tretheway,

---

[3]     That employment agreement also included a confidentiality provision.  AMID's preliminary-injunction application did not address the likelihood of succeeding on the merits of a breach-of-contract claim against Justin Noland based on the confidentiality provisions.  (Docket Entry No. 5 at 10–24) (addressing only trade dress and copyright claims).  Yet AMID raises this in its proposed findings of fact and conclusions of law and seeks relief not previously requested, including an injunction against Noland continuing to work at MedicAlert.  (Docket Entry No. 49 at 35–36).  The court permitted AMID to introduce evidence about Noland for the purpose of showing MedicAlert's intent with regard to the alleged trade-dress infringement.  AMID did not introduce other evidence that Noland violated the confidentiality provisions of his agreement with AMID.

AMID did not explain at the preliminary-injunction hearing the delay in filing this suit against Noland and seeking a preliminary injunction against him.  Given the delay and the lack of evidence supporting its breach-of-contract claim, AMID cannot show irreparable harm from Noland's continued employment at MedicAlert.  And the relief AMID seeks as to Noland—that he cease working at MedicAlert—would be disruptive and inequitable given the fact that it has been 2 ½ years since Noland left AMID to work for MedicAlert.

proposing that AMID and MedicAlert enter into a partnership or other business combination.  (Def. Ex. 22).  Russell did not mention any concern about MedicAlert's marketing displays.  (*Id.*).  Before he received a response to his July 6, 2015 email, Russell made a "more formal complaint," sending a letter to both Tretheway and to MedicAlert's new CEO, David Leslie, on July 14, 2015.  (Pl. Ex. 30; Tr. 3:28–29).  In the letter, Russell asserted that MedicAlert's marketing director, Justin Noland, who had been AMID's marketing director from 2012 to April 2014, had violated his noncompete agreement with, and "totally disregarded" his confidentiality obligations to, AMID.  (Pl. Ex. 30). Russell explained that the "action AMID will take with respect to these breaches is still being evaluated.  I just thought you should have knowledge that it took place and that we take it as a serious violation."  (*Id.*).  Russell enclosed a photograph of the MedicAlert display that AMID claimed infringed its protected trade dress.  (*Id.*).  Russell's letter stated that the MedicAlert display was a "virtual carbon copy of a display [AMID has] developed and marketed for many years, well before Noland was a part of the marketing staff here."  (*Id.*).  The letter accused MedicAlert of basing its marketing display on AMID's "intellectual property" that Noland "may have brought with him and shared with MedicAlert marketing management."  (*Id.*).  Russell described the display shown on MedicAlert's website as "clearly an extreme knockoff" of AMID's display.  (Tr. 3:35).

David Leslie, MedicAlert's new CEO, responded to Russell's email on July 20.  Leslie thanked Russell for his offer of a partnership or other business relationship and explained that MedicAlert was not interested.  (Def. Ex. 24).  Leslie did not respond to Russell's infringement allegations.  (*See id.*).

On July 29, 2015, Russell sent Leslie another email, attaching Noland's employment contract with AMID.  (Def. Ex. 25.).  The contract had a one-year noncompete that had expired in May 2015.

(*Id.*; Pl. Ex. 1).  Russell expressed concern about Noland working for MedicAlert, explaining that "our concerns go beyond the non-compete violation itself.  It is compounded by the taking and immediately applying of methods, designs, artwork, taglines, etc. developed here by persons other than himself.  While much of this is not trademarked or protected formally, it is certainly in a gray area from a legal standpoint.  But in the ethical realm, most everyone I've mentioned this to outside our organization, reacts that they've not often seen anything so blatant." (Def. Ex. 25).   During the preliminary injunction hearing, Russell explained that he was "referring to trade dress" in this email, focusing on the MedicAlert marketing display shown on the website.  (Tr. 3:34–35).   Russell testified that he wanted to emphasize that the "display observed on the website was clearly an extreme knockoff" of the AMID displays and his "great concerns about the use of [the MedicAlert displays] in the marketplace." (*Id.*).

Leslie responded to Russell's infringement concerns in a letter dated August 27, 2015.  (Def. Ex. 26.).  Leslie told Russell that MedicAlert would not fire Noland because the noncompete clause in the employment agreement with AMID had already expired.  (*Id.*).  Leslie noted that MedicAlert would "remain mindful of all the operating boundaries concerning marketing materials between our two companies . . . ." (*Id.*).  Leslie did not agree to recall, stop using, or change the MedicAlert marketing displays or other marketing materials.

On September 4, 2015, Russell responded to Leslie's August 27 letter.  (Def. Ex. 27).  Most of Russell's response was a proposal for MedicAlert and AMID to form a marketing partnership.  Russell responded to Leslie's letter, stating that it "[s]ounds like the matter is closed in your mind, but I may come back to you with some final thoughts." (*Id.*).  Russell did not ask MedicAlert to stop distributing the displays, recall them, or change them.  (*See id.*).  Russell did not write to Leslie

again about his infringement concerns.  (Tr. 1:227–28).

On January 6, 2016, Flowers received a text message from an AMID coworker who had seen a MedicAlert display in a doctor's office in Austin, Texas.  Flowers told Russell about the text message.  (*Id.* at 2:12–13, 3:89).  The MedicAlert display described in the text message is the same one that Flowers had seen on MedicAlert's website in June 2015 and that Russell cited in his July 14, 2015 letter.  (*Id.*; Pl. Ex. 17).  Also on January 6, Flowers called the doctor's office in Austin and asked a staff member about the MedicAlert display.  (Pl. Ex. 20).  That same day, Russell contacted Leslie to propose a "business combination" with, or "asset acquisition" from, MedicAlert.  (Def. Ex. 28).  Despite knowing that the MedicAlert marketing display had been sent to doctors' offices and was on MedicAlert's website, Russell said nothing in the January 6 email about MedicAlert's display or the accompanying letter, MedicAlert's website,  or its continued employment of Noland. (*Id.*; Tr. 3:89–90, 1:227–28).  Leslie did not respond to the January 6, 2016 email.

AMID and Russell filed this lawsuit on April 27, 2016.  (Docket Entry No. 1).  Nearly eleven months elapsed between when AMID first saw the allegedly infringing MedicAlert displays on the website and when AMID filed this suit.

## II.    The Legal Standards

### A.    Preliminary Injunctions

A preliminary injunction is an "extraordinary remedy."  *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 536 (5th Cir. 2013).  A court may grant a preliminary injunction "only if the movant establishes (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an

injunction will not disserve the public interest." *Id.* at 536–37 (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)).

### B.    The Lanham Act

The Lanham Act provides trademark protection under two separate sections.  First, under § 2, 15 U.S.C. § 1052, a party can protect its trademark by registering it with the United States Patent and Trademark Office.  *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209 (2000).  Registration "entitles the owner to a presumption that its mark is valid."  *Id.*  To establish trade-dress infringement under § 43(a) for an unregistered mark, a plaintiff must first demonstrate that its trade dress is either inherently distinctive or that it has acquired distinctiveness through secondary meaning.  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992).  An otherwise inherently distinctive trade dress is entitled to protection only if it is also nonfunctional.  *Id.*  Second, to establish infringement, a plaintiff must show that a defendant's trade dress creates a likelihood of confusion with the plaintiff's.  *Id.* at 769–70.

### C.`    The Copyright Act

To show copyright infringement, AMID must show both (1) ownership of the copyright material, which neither party disputes, and (2) copying by MedicAlert.  *Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 790 (5th Cir. 1999).  A copy is legally actionable if the alleged infringer used the copyrighted material to create his own work, and substantial similarity exists between the two works.  *Id.*  "A side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as substantially similar."  *General Universal Systems, Inc. v. Lee*, 379 F.3d 131, 142 (5th Cir. 2004).  While the standard is "of necessity vague," infringement exists if an "ordinary observer, unless he set out to detect the

disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Stutts v. Texas Saltwater Fishing Magazine, Inc*., Civ. No. 6:13-cv-10, 2014 WL 1572736, at *3 (S.D. Tex. Apr. 18, 2014) (Costa, J.) (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960)).

## III.    Findings of Fact[4]

### A.    The Trade-Dress Infringement Claim

Because AMID did not register its claimed trade dress, it is not entitled to the presumptions registration provides.  AMID must show that its claimed trade dress is valid, distinctive, and not functional.  *Wal-Mart*, 529 U.S. at 210–11.

"Trade dress refers to the total image and overall appearance of a product and may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product." *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 251 (5th Cir. Tex. 2010) (citing *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 536 (5th Cir. 1998) (internal quotation marks omitted)); *accord* RESTATEMENT § 16, at 156 ("The design of elements that constitute the appearance or images of goods or services as presented to prospective purchasers, including . . . displays [and] decor, . . . is eligible for protection as a mark.").  Trade-dress protection has been extended to the overall "motif" of a restaurant, *Two Pesos*, 505 U.S. at 765, and to the layout of a golf course, *Pebble Beach*, 155 F.3d at 537.  "The purpose of trade dress protection, like trademark protection, is to 'secure the owner of the trade dress the goodwill of his business and to protect the ability of consumers to distinguish among competing products.'"

---

[4] Any findings of fact that are more properly conclusions of law are so deemed.  Any conclusions of law that are more properly findings of fact are so deemed.

*Amazing Spaces*, 608 F.3d at 251 (quoting *Two Pesos*, 505 U.S. at 774).

### 1.    Inherent Distinctiveness

A claim under § 43(a) for an unregistered mark requires the plaintiff to show that the "[the] identifying mark . . . is inherently distinctive or . . . has acquired distinctiveness through secondary meaning." *Two Pesos,*, 505 U.S. at 769.  Marks whose "intrinsic nature serves to identify their particular source" are inherently distinctive. *Wal-Mart*, 529 U.S. at 210.  If a mark is not inherently distinctive, it is protected if "it has developed secondary meaning, which occurs when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Id.* at 211.  The parties dispute whether AMID's claimed trade dress is inherently distinctive; whether this court must or may move to a secondary-meaning analysis; and whether it has acquired secondary meaning.

The law relating to whether a trademark is inherently distinctive is more developed for word marks than for trade dress. *Forney Indus., Inc. v. Daco of Missouri, Inc.*, 835 F.3d 1238, 1245 (10th Cir. 2016).  In *Two Pesos*, 505 U.S. at 773–74, the Supreme Court resolved a circuit split and held that a product's trade dress, like other forms of trademark, could be protected under the Lanham Act if the trade dress was inherently distinctive.  Courts have since struggled to devise a test for when a trade dress achieves that status.  *See generally* 1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8:13 (4th ed.) (McCarthy).

Some courts have used the framework for word marks set out in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4.12 (2d Cir. 1976).  The *Abercrombie* test separates word marks into five categories to assist in determining whether a particular mark is inherently distinctive: (1) fanciful; (2) arbitrary; (3) suggestive; (4) descriptive; or (5) generic.  *Id.* at 9–11 & n.12.

14

Because that framework was designed for word marks, it can be difficult to apply in the trade-dress

context.  *See Amazing Spaces*, 608 F.3d at 243 ("Both the Supreme Court and scholars have

questioned the applicability of the *Abercrombie* test to marks other than words."); 1 McCarthy,

*supra*, § 8:13 ("Courts have had considerable difficulty in trying to apply to trade dress the

traditional spectrum of marks categories which were created for word marks—the *Abercrombie* test

. . . The problem is that the *Abercrombie* spectrum was specifically developed for word marks and

does not translate into the world of shapes and designs."); *cf. Wal–Mart Stores*, 529 U.S. at 210–13

(the *Abercrombie* test has been applied "[i]n the context of word marks," but not attempting to apply

it to a trade-dress infringement claim).

The Fifth Circuit has moved away from, though not abandoned, the *Abercrombie* test in cases

not involving word marks.  *See Nola Spice Designs, LLC v. Hayden Enterprises, Inc.*, 783 F.3d 527,

540 (5th Cir. 2015) ("[W]e recently embraced the *Seabrook Foods* test to determine the inherent

distinctiveness of a design mark, although we did not 'go so far as to hold that the *Abercrombie* test

is eclipsed every time a mark other than a word is at issue.'") (quoting *Amazing Spaces*, 608 F.3d

at 243).  The Fifth Circuit uses the *Seabrook Foods* factors to determine whether a design is arbitrary

or distinctive:

> (1) whether it was a common basic shape or design; (2) whether it was unique or
> unusual in a particular field; (3) whether it was a mere refinement of a commonly-
> adopted and well-known form of ornamentation for a particular class of goods
> viewed by the public as a dress or ornamentation for the goods; or (4) whether it was
> capable of creating a commercial impression distinct from the accompany words.

*Amazing Spaces*, 608 F.3d at 243 (quoting *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 568 F.2d

1342, 1344 (C.C.P.A. 1978)).  The first three *Seabrook Foods* factors "are merely different ways to

ask whether the design, shape or combination of elements is so unique, unusual or unexpected in this

15

market that one can assume without proof that it will automatically be perceived by customers as an indicator of origin—a trademark." *Id.* "The issue is whether the trade dress is of such an unusual design that a buyer will immediately rely on it to differentiate the source of the product." 1 McCarthy, *supra*, at § 8.13.

Although the Supreme Court has held that trade dress can be inherently distinctive, it has given little guidance on what is required. *Two Pesos* did not adopt a specific test for inherently distinctive trade dress, in upholding the lower court's ruling that the trade dress for the Mexican-themed restaurant chain was inherently distinctive.[5]  The Court's opinion did not explain the key elements to establish inherent distinctiveness or whether the trade dress in that case was inherently distinctive. *See* 505 U.S. at 770 (whether the trade dress was inherently distinctive "is [not] before us"). The Court addressed only whether trade dress can be inherently distinctive. The answer was "yes," but the "when" and "how" questions remained. *See id.* at 773–76.

The Supreme Court has been more definitive in saying when trade dress cannot be inherently distinctive. *See Forney Industries*, 835 F.3d at 1247. Since *Two Pesos*, the Court has carved out certain types of trade dress that by their nature are not inherently distinctive and can be protected only if they  have secondary meaning. First, in *Qualitex Co. v. Jacobson Products Co.*, 514 U.S.

---

[5]  *See* 1 McCarthy, *supra*, at § 8.13 ("The Supreme Court [in *Wal–Mart Stores*] did not require use of the *Abercrombie* test for classifying packaging trade dress as either inherently distinctive or not."). In *Two Pesos*, the Supreme Court upheld the lower court's ruling that the trade dress was inherently distinctive. In that case, the Court gave the following description of the trade dress for a Mexican-themed restaurant chain:

> a festive eating atmosphere having interior dining and patio areas decorated with artifacts, bright colors, paintings and murals. The patio includes interior and exterior areas with the interior patio capable of being sealed off from the outside patio by overhead garage doors. The stepped exterior of the building is a festive and vivid color scheme using top border paint and neon stripes. Bright awnings and umbrellas continue the theme.

505 U.S. at 765.

16

159 (1995), the Court considered whether the green-gold color of dry-cleaning press pads was entitled to Lanham Act protection. *See id.* at 161. The Court resolved a circuit split and held that the Lanham Act "permits the registration of a trademark that consists, purely and simply, of a color." *Id.* at 160–61. "[A] product's color is unlike 'fanciful,' 'arbitrary,' or 'suggestive' words or designs, which almost automatically tell a customer that they refer to a brand." *Id.* at 162–63. But the Court could see no reason why a product's color should or could not be protected if it had acquired secondary meaning. *See id.* at 163–66.

Second, in *Wal–Mart*, the Court held that a product design could not be inherently distinctive. 529 U.S. at 212. The Court reaffirmed that "color[ ] is not inherently distinctive," without distinguishing between the color of a product package or of a product itself. *Id.* "The attribution of inherent distinctiveness to certain categories of word marks and product packaging derives from the fact that the very purpose of attaching a particular word to a product, or encasing it in a distinctive packaging, is most often to identify the source of the product." *Id.* But "[i]n the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist." *Id.* at 213. The Court emphasized the need for clear rules about what can be inherently distinctive:

> Consumers should not be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves by a rule of law that facilitates plausible threats of suit against new entrants based upon alleged inherent distinctiveness. How easy it is to mount a plausible suit depends, of course, upon the clarity of the test for inherent distinctiveness, and where product design is concerned we have little confidence that a reasonably clear test can be devised.

*Id.*; *see id.* at 214 ("Competition is deterred . . . not merely by successful suit but by the plausible threat of successful suit.").

Acknowledging that there may be close cases in which courts will have "to draw difficult

17

lines between product-design and product-packaging trade dress," the Court instructed lower courts to "err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning." *Id.* at 215.  "The very closeness will suggest the existence of relatively small utility in adopting an inherent-distinctiveness principle, and relatively great consumer benefit in requiring a demonstration of secondary meaning."  *Id.*

Describing AMID's trade dress is the start of determining whether it is inherently distinctive. AMID's motion for a preliminary injunction listed seven elements that make up its asserted protected trade dress:

1. marketing plan of counter display order forms package for easy mailing and delivery to health care professional offices and others;
2. metallic-looking bracelet or tag components on the display;
3. see-through opening in display cover as shipped;
4. banner wrapper around order forms;
5. integral pull-off order form with photos of products, including metal-tag elements and bracelets;
6. clear wrapper enclosing display mailer; and
7. easy customer display setup for counter use.

(Docket Entry No. 5 at 12–13).

In its proposed findings of fact and conclusions of law filed before the preliminary injunction hearing, AMID changed its trade-dress definition.  (Docket Entry No. 34 at 17).  AMID's proposed findings and conclusions listed the revised trade-dress definition as:

1. marketing plan of counter display order forms package for easy mailing and delivery to health care professional offices and others. This plan includes the active participation of healthcare providers and their staff in utilizing the counter display in their offices;
2. metallic-looking bracelet or tag components on the display arranged in a carefully determined configuration;
3. see-through opening in display cover as shipped;
4. banner wrapper around order forms with the trademark "Medical IDs save lives!";
5. integral pull-off order form with photos of products, including metal-tag elements and bracelets;

18

     6. transmittal letter outlining a complementary medical ID program for providers, identifying end users who may benefit from a medical ID, and listing institutions that recommend using a medical ID;

     7. clear wrapper enclosing display mailer with transmittal letter that can be read without opening the package; and

     8. easy customer display setup for counter use.

(*Id.*).

During the preliminary-injunction hearing, when asked to address the elements of the claimed trade dress, AMID's witnesses and counsel reaffirmed that the earlier seven-part list made up what AMID claimed as its trade dress. As the court noted, the trade-dress definition had a "moving-target aspect" to it. (Tr. 3:138).

In its proposed findings of fact and conclusions of law submitted after the preliminary-injunction hearing, AMID again changed its trade-dress definition.[6] (Docket Entry No. 49 at 3–4). For the first time, AMID asserted that it had three "independent trade dress claims." (*Id.* at 3). The first was a "Marketing Plan and Scheme" that included:

     a. unsolicited mass-mailing to doctor and other professional offices of display;
     b. an easel display with integral order forms;
     c. real jewelry facsimiles in the upper portion of the display;
     d. an introductory letter;
     e. a see-through cardboard cover over the jewelry with one medal visible; and
     f. a clear mailing wrapper.

(*Id.*). AMID's second trade-dress claim included the "[p]ackaging as received by the professional office of the mailed [d]isplay":

     a. a three-panel display with top panel, followed by a larger panel containing real jewelry facsimiles, with an order form pad taking up approximately 2/3 of the

---

[6] MedicAlert moves to strike the trade-dress definition AMID included in the proposed findings of fact and conclusions of law. (Docket Entry No. 51). AMID responds that this description is essentially the same as the one asserted during the preliminary injunction hearing. (Docket Entry No. 52). Rather than striking the modified description, the court will consider each of AMID's trade-dress descriptions in the analysis.

     display face;

    b. a see-through cardboard cover over the jewelry with one item visible;

    c. an introductory letter on the backside of the mailer;

    d. a banner wrapper around the lower portion about the order forms; and

    e. a clear wrapper around the entire display.

(*Id.* at 4).  AMID's third trade-dress claim included the "display as used in the professional offices":

    a. an easel display having three panels on the front portion of the display;

    b. a top panel, followed by a larger central panel with real jewelry facsimiles
       followed by an order form on the lower portion of the display; and

    c. an order form pad below the central panel taking up approximately 2/3 of the
      display face with photographs of jewelry on the face of the order form.

(*Id.*).

     A court and the parties cannot "coherently define exactly what the trade dress consists of and determine whether that trade dress is valid and if what the accused is doing is an infringement" until after the party seeking trade-dress protection submits the "discrete elements" making up the its claimed trade dress.  1 McCarthy, *supra*, § 8:3.  AMID has provided not one, not two, but three distinct sets of claimed trade-dress elements.  (*See* Docket Entry No. 5 at 12–13; Docket Entry No. 34 at 17; Docket Entry No. 49 at 3–4).  The three sets have common elements, but they are not identical.  The third set separates its claim into three trade dresses that include for the first time the proportion of space taken up by the order form pad, photographs of jewelry, and the number, position, and size of the panels.

     It is unclear to what extent a plaintiff can change its definition of the allegedly protected and infringed trade dress without amending the complaint.  1 McCarthy, *supra*, § 8:3.  "In the law of Patents, the Supreme Court has observed that a patent is a property right and like any property right, its boundaries should be clear.  The same is true of trade dress."  *Id.*   The need to identify trade-dress elements is well-recognized.  "Without . . . a precise expression of the character and scope of

20

the claimed trade dress, litigation will be difficult, as courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market" or to "shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection." *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997). "And if a court is unable to identify what types of designs will infringe a trade dress, how is a competitor . . . to know what new designs would be subject to challenge by [the trademark holder]?" *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 117 (2d Cir. 2001). The problem exists here. Which of AMID's definitions of its protectable trade dress should the court use to identify whether the elements are distinctive, much less otherwise protected, or to fashion a remedy for infringement?

The Tenth Circuit has addressed inconsistently defined trade dress in a case involving product packaging. In *Forney Industries*, the court noted that the "failure in the description cannot be blamed on any shortcoming in counsel's power of expression. It is probably the best that one could do, given the variety of packaging that [the plaintiff] has used on its products over the years." 835 F.3d at 1251–53. Heeding the Supreme Court's statement in *Wal-Mart* "to be cautious about applying vague, litigation-friendly tests for inherent distinctiveness," the Tenth Circuit found that the plaintiff had failed to establish an inherently distinctive trade dress. *Id.* at 1253; *Wal-Mart Stores*, 529 U.S. at 215.

Like the plaintiff in *Forney*, AMID has changed its marketing materials over the years. This may be one reason for the "moving target" of AMID's claimed trade dress. AMID's witnesses testified that all variations of the display and packaging it had used, and any similar display or packaging were included in its protectable trade dress because they all shared a "family look." (Tr. 1:284–86). AMID's counsel stated in his opening statement at the injunction hearing that

21

MedicAlert's displays "infringes on our family look," (*Id.* at 1:18), and that AMID has "developed this particular family look over an extensive period of time, and it's essentially been fixed with some minor modifications, but is essentially a recognizable look." (*Id.* at 1:6).

What this "family look" includes remains unclear. Flowers's testimony about what AMID included in the "family look" was elastic and expansive. Flowers defined the "family look" as a "general look and feel that we have kept our packages to look like since around—I mean, really, from very early on, but typically this—the general family look that we are using, we have been using since 2010." (*Id.* at 1:275–76). Flowers testified that the "family look" was shown in Plaintiff's Exhibit 23. (*Id.* at 2:6). But that exhibit shows varying displays AMID used from 2009 to the present. (Pl. Ex. 23 at 62–67). Flowers testified that AMID sent many packages, but she insisted that they all had "our look and feel." (Tr. 2:77). Flowers testified that the "ugly cardboard" was part of the "family look of materials," but later she acknowledged that was no longer included in the marketing displays. (*Id.* at 2:58). She testified that "[c]onsistent throughout would be the—the cardboard around the top of it," but she admitted that "now it is a more sleek-looking black. At one time, that little peephole wasn't even there, but we wanted to make this, again, kind of stand out to the folks opening the mail. We have added the—the band around the paper wrapper around the forms, again, to kind of make it pop." (*Id.* at 1:285). Flowers testified that it was "the marketing team's decision to make tweaks and changes to the family look of our artwork and our materials over time," but insisted that those "tweaks" did not impact the overall "family look." (*Id.* at 2:61) ("I would consider that a part of our family look."). Flowers claimed that 80 percent of the displays distributed since 2012 had this "family look." (*Id.* at 1:275–76, 1:286). It is unclear what makes up the other 20 percent.

22

Flowers acknowledged that it was "hard to keep all of this straight." (*Id.* at 2:77). One problem is that the "family look" encompasses displays with clearly different shapes, sizes, text size and font, color, artwork, layout, and materials. *E.g.,* one display has tear off-sheets but no facsimile jewelry, (Pl. Ex. 44; Def Ex. 32, Def. Ex. 33); one has an ad with the slogan, "A Medical ID speaks for you when you can't," (Def. Ex. 34); ad likely "displayed in a rotating capacity on one of [AMID's] websites," (Tr. 2:110–111); there are brochures in lucite holders, without facsimile jewelry, designed for Publix, (Def. Ex. 39); there is a double-pad, vertical, white-and-green display, (Def. Ex. 71); there are 20,000 copies of Defendant's Exhibit 71, a blue-and-green easel display that advertised both One Call Alert and AMID's products, had likely been mailed out as a "test pilot," (Tr. 2:92–93); and a blue-and-white display that had been created for CVS, (Def. Ex. 73). There are numerous photos showing changing displays from 2006 to the present. (Pl. Ex. 23).

Some of the AMID displays do not contain any of the elements AMID now identifies as defining its trade dress. For example, a display created for Publix has a lucite holder, rather than an easel display, brochures instead of tear-off sheets, and no facsimile jewelry, (Def. Ex. 39), while a display created for Walgreens has no tear-off sheets and no facsimile jewelry, (Def. Ex. 29). Flowers explained that instead of the easel display, AMID sometimes sent brochures. (Tr. 2:101). As she acknowledged, "it could be a variety of things." (*Id.*).

AMID's claim that this changing "family look" is its protected trade dress has inconsistently and broadly defined elements. Courts have rejected this approach. "Several courts have adopted a requirement that a plaintiff seeking to protect its unregistered trade dress do more than just point to the 'overall look' of its trade dress; it must 'articulat[e] the specific elements which comprise its distinct dress.'" *Forney Indus.*, 835 F.3d at 1252 (quoting *Landscape Forms, Inc.*, 113 F.3d at 381);

*see also, e.g., Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 309 (3d Cir. 2014) ("[I]t is the plaintiff's duty to articulate the specific elements which comprise its distinct dress." (brackets and internal quotation marks omitted)); *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 415 (6th Cir. 2006) ("It will not do to solely identify in litigation a combination as 'the trade dress.' Rather, the discrete elements which make up that combination should be separated out and identified in a list." (brackets and internal quotation marks omitted)).  It is AMID's burden to identify its claimed trade dress.  It has failed to do so with sufficient clarity or consistency.

There is another problem in finding that one or more versions of AMID's claimed trade dress is inherently distinctive.  While certain types of product packaging can be inherently distinctive, product design is protected only on a showing of secondary meaning.  *Wal-Mart*, 529 U.S. at 215–216.  In *Wal-Mart*, the Court acknowledged that there would be "hard cases at the margin," in which courts would struggle to classify product packaging or product design as protectable trade dress.  *Id.* at 215.  But "[t]o the extent there are close cases, we believe that courts should err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning."  *Id.*  This guidance helps.  AMID argues that its trade dress "is akin to product packaging."  AMID's products are bracelets or dog tags, but AMID's purported trade dress does not "package" the actual jewelry AMID sells.  The consumer cannot buy any AMID products from the displays themselves.  AMID's displays show photos or facsimiles of products, but do not contain the products to sell.  Packaging, as the word implies and as the cases cited by AMID demonstrate, contains or accompanies the product to be sold.  *Cf. Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 702–703 (5th Cir. 1981) (a bottle for gardening supplies considered product packaging); *Sicilia Di R. Biebow & Co v. Cox*, 732 F.2d 417, 423 (5th Cir. 1984) (bottles containing

lemon and lime juice were product packaging); *Regal Jewelry Co., Inc. v. Kingsbridge Int'l, Inc.*, 999 F. Supp. 477, 481 (S.D. N.Y 1998) (colored boxes containing novelty items were product packaging). Nor does this case involve the design of the products—the medical-identification jewelry that AMID sells.

AMID's claimed trade dress falls somewhere in the middle of the product-packaging and product-design spectrum. *Wal-Mart*, 529 U.S. at 215. The First Circuit has followed *Wal-Mart*'s guidance and found that trade dress falling between product design and product packaging must have secondary meaning to be protected under the Lanham Act. In *Yankee Candle Co. v. Bridgewater Candle Co.*, LLC, 259 F.3d 25, 41 (1st Cir. 2001), the plaintiff sought Lanham Act trade-dress protection for "all the trappings associated with the sale of the candle—i.e., the candle-holders, the Vertical Display System, the labels, and the catalog." *Id.* at 40. The First Circuit held that while the labels on the candles were product packaging and may be inherently distinctive, "when combined with actual candle features, candle containers, the catalog, and the in-store display system, the claim is no longer a product-packaging one." *Id.* at 40–41. Nor could the claim be categorized as one for product or design configuration, "as that term has generally been defined to be limited to features inherent to the actual physical product: here, the candles." *Id.* at 41. Because the claimed trade dress was "at the margin," the First Circuit required the plaintiff to show secondary meaning. *Id.*

The court follows the Supreme Court's guidance and the First Circuit's helpful application, and finds that to prevail on its trade dress-infringement claim, AMID must show that its trade dress has acquired secondary meaning. *See Wal-Mart*, 529 U.S. at 215; *Yankee Candle Co.*, 259 F.3d at 41.

### 2.       Secondary Meaning

Trade dress acquires distinctiveness, even if it is not inherently distinctive, if it has developed secondary meaning.[7]  This occurs when, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself."  *Wal-Mart Stores*, 529 U.S. at 211 (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851, n. 11 (1982)).  "[T]he mark must denote to the consumer a single thing coming from a single source to support a finding of secondary meaning."  *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 543 (5th Cir. 2015).  "The inquiry is one of the public's mental association between the mark and the alleged mark holder."  *Amazing Spaces*, 608 F.3d at 247–48 (quoting *Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 476 (5th Cir. 2008)).  "Because the primary element of secondary meaning is a mental association in buyer[s'] minds between the alleged mark and a single source of the product, the determination whether a mark or dress has acquired secondary meaning is primarily an empirical inquiry."  *Id.* at 248 (quoting *Sunbeam Prod., Inc. v. W. Bend Co.*, 123 F.3d 246, 253 (5th Cir. 1997)).

The general and varying nature of AMID's trade-dress definition is again problematic.  In its varying trade-dress definitions, AMID asserts as protected the manner in which its displays are shipped and used in doctors' offices.  It asserts protection for its "marketing plan of counter display order forms package for easy mailing and delivery to health care professional offices and others." (Docket Entry No. 5 at 12–13); (Docket Entry No. 34 at 17).  In its motion for preliminary injunction

---

[7] The *Wal–Mart Stores* Court noted that the term "secondary meaning" "is often a misnomer in th[e] context [of nonword marks], since nonword marks ordinarily have no 'primary' meaning." 529 U.S. at 211. The Court suggested that a clearer description of the concept would use the term "acquired meaning," but the Court followed "the conventional terminology" of "secondary meaning."  *Id.*  Like the Fifth Circuit in *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225 (5th Cir. 2010), this court follows the conventional terminology as well.  *Id.* at 247 n.21.

26

and preliminary proposed findings of fact and conclusions of law, four of the seven trade-dress

elements were packaging designed to be removed before putting it out for potential buyers to see:

> (1) see-through opening in display cover as shipped;
> (2) banner wrapper around order forms;
> (3) clear wrapper enclosing display mailer; and
> (4) easy customer display setup for counter use.

(Docket Entry No. 5 at 12–13); (Docket Entry No. 34 at 17).  Many of these elements are removed

by the doctor's staff when they open the mail and are not on the display when the doctors or the

patients or family members might encounter them in a waiting room or lobby.

AMID's posthearing proposed findings of fact and conclusions of law similarly included in

its list of trade-dress elements that may not be seen by most doctors or by any potential buyers, the

patients.  In AMID's first trade-dress definition, the "marketing plan and scheme" includes:

> (1) unsolicited mass mailing to doctor and other professional offices;
> (2) an introductory letter;
> (3) a see-through cardboard cover over the jewelry with one medal visible; and
> (4) a clear mailing wrapper.

(Docket Entry No. 49 at 3–4).

AMID's second trade-dress definition, the "packaging as received by the professional office

of the mailed display," specifies elements again not seen by most doctors or the patients who are the

ultimate purchasers.  These include:

> (1) a see-through cardboard cover over the jewelry with one item visible;
> (2) an introductory letter on the backside of the mailer;
> (3) a banner wrapper around the lower portion about the order forms;
> (4) a clear wrapper around the entire display.

(*Id.* at 4).  The evidence is undisputed that these elements are designed to be thrown away by the

doctors' staff who open the mail.  This may be before the doctors, and clearly before the patients, see

the display.  (Tr. 1:12).  AMID contends that these elements are nonetheless protectable because they

27

are seen by the "gatekeepers"—the staff in the medical office who make the decision to place the display on a counter visible to the "end users," the patients.

In its final version of its claimed trade-dress elements, AMID included a separate claim of trade dress in the "display as used in the professional offices," which is seen by patients, family members, or other visitors to doctors' offices. This claim included:

(1) an easel display having three panels on the front portion of the display;
(2) a top panel, followed by a larger central panel with real jewelry facsimiles, followed by an order form on the lower portion of the display; and
(3) an order-form pad below the central panel, taking up approximately 2/3 of the display face, with photographs of jewelry on the order-form face.

(Docket Entry No. 49 at 4). This "display" trade dress is seen by, and intended for, the buying public—patients and family members who may purchase medical-identification jewelry. These purchasers of medical-identification jewelry are relevant to the secondary-meaning inquiry. *Nola Spice Designs, L.L.C.*, 783 F.3d at 545 (the secondary meaning analysis focuses on the effectiveness of "altering the meaning of [the trade dress] to the consuming public").

The doctors' office staff acts as "gatekeepers"; it stretches current law to analyze them as the relevant consumer in the secondary-meaning inquiry. The patients and family members who, as the buying public, clearly are the relevant consumers. Where do the doctors fit in? They are not the intended purchasers of medical-identification jewelry, but they can serve an important role if they are involved in deciding whether to place the display in their waiting room or whether to recommend medical-identification jewelry. The letters AMID and MedicAlert enclose in their displays explain to doctors why such jewelry may be medically necessary to at-risk patients. (*See* Pl. Ex. 2; Def. Ex. 11). In this role, doctors are acting as one of the "gatekeepers" of the medical-identification jewelry. In the second role, doctors are acting as a different type of gatekeeper. *See Bonito Boats*, 489 U.S.

at 157; *Nola Spice Designs, L.L.C.*, 783 F.3d at 545.  Out of an abundance of caution, both office staff

and doctors, as well as patients, are considered in the analysis.

AMID's "gatekeeper" argument stretches the concept of secondary meaning beyond what the

cases seem to support.  Secondary meaning reflects the consumers' perception of product source.

Courts must "consider the marks in the context that a customer perceives them in the marketplace .

. . ." *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 485–86 (5th Cir. 2004); *Bonito Boats,*

*Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 157 (1989) ("The law of unfair competition has its

roots in the common-law tort of deceit: its general concern is with protecting *consumers* from

confusion as to source."); 1 McCarthy, *supra*, § 2:8 ("Today, the keystone of that portion of unfair

competition law which relates to trademarks is the avoidance of a likelihood of confusion in the

minds of the *buying public*.") (emphasis added).  The relevant question in evaluating secondary

meaning "is not the extent of the promotional efforts, but their effectiveness in altering the meaning

of [the trade dress] to the consuming public." *Nola Spice Designs, L.L.C.*, 783 F.3d at 545.  The

"gatekeeper" office staff is not a consumer of medical-identification jewelry.  The packaging

elements AMID claims in its trade dress may only be seen by these "gatekeepers," or perhaps by the

doctors, and cannot have acquired secondary meaning because they are never seen by the consuming

public.  *See id.*

AMID also cites cases that it contends protect sales techniques, such as the sales technique

of mailing unsolicited wrapped displays to doctors' offices.  (Docket Entry No. 49 at 20–21) (citing

*John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983) (trade dress

"involves the total image of a product and may include features such as size, shape, color or color

combinations, texture, graphics, or even particular sales techniques."); *Original Appalachian*

*Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 831 (11th Cir. 1982) (trade-dress protection for sales technique for doll "adoption"); *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 633 (6th Cir. 2002) (Abercrombie's in-store displays and its sales-associate team constitute a "particular sales technique.")).  These cases do not go as far as AMID urges.  The "sales techniques" in the cited cases could be protected trade dress in part because the techniques were aimed at, and seen by, the buying public entering the store.  *See Abercrombie & Fitch Stores, Inc.*, 280 F.3d at 633; *see also Original Appalachian Artworks, Inc.*, 684 F.2d at 831 (the doll-adoption procedure "represents a sales technique designed to make the product readily identifiable to consumers and unique in the marketplace," and was part of the product packaging).[8]  The parties have not cited cases in which a court found protectable trade dress, when, as here, most of the purported trade-dress elements are never seen by members of the buying public.

"[I]t is the total combination of elements of the 'trade dress' as defined by the plaintiff that is at issue."  1 McCarthy, *supra*, § 8:2.  AMID's displays enclosed in their packaging are first seen by the "gatekeeper" office staff, who receive and sort mail, presumably opening the packages and discarding the wrapping.  By the time members of the buying public—the patients or their family members—see the displays, much of what AMID claims as its protected trade dress has been removed and discarded.  Because many elements of AMID's claimed trade dress are the packaging that is discarded by the "gatekeeper" office staff, it is difficult for AMID to show that the combination, or totality of the trade-dress elements it claims is seen by, much less is distinctive in, the minds of the consumers.  *Amazing Spaces*, 608 F.3d at 249 ("[C]ompetitors may use individual

---

[8]  AMID also cited *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983).  That case involved product design, not sales technique, and is irrelevant to AMID's argument.  *Id.* at 969–70, 981–84.

elements in Taco Cabana's trade dress, but the law protects the distinctive totality.") (quoting *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1120 (5th Cir. 1991)); *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1050 (9th Cir. 1998) ("[T]he proper inquiry is not whether individual features of a product are functional or nondistinctive but whether the whole collection of features taken together are functional or nondistinctive.").

The Fifth Circuit has identified seven factors for courts to consider in determining whether a claimed trade dress has acquired secondary meaning.  The factors are the:

> (1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the trade dress.

*Amazing Spaces*, 608 F.3d at 248 (quoting *Smack Apparel*, 550 F.3d at 476).  "In considering this evidence, the focus is on how it demonstrates that the meaning of the mark or trade dress has been altered in the minds of consumers." *Id.* (quoting *Pebble Beach Co.*, 155 F.3d at 541 *and citing Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 795 (5th Cir. 1983) *abrogated by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004) ("'[T]he question is not the *extent* of promotional efforts, but their *effectiveness* in altering the meaning of the term to the consuming public.'")).  Each factor is considered below.

### a. The Length and Manner of Using the Trade Dress

AMID presented evidence that it has used the "family look" for its marketing displays since 2010.  (Tr. 2:284–86).  There is no evidence of how long the specific trade dress it claims consumers saw was consistently used.  Flowers testified that the displays could vary in elements but were in the "family look."  (*Id.* at 1:284–86).  "Consistent throughout would be the—the cardboard around the top of it.  Of course, now it is a more sleek-looking black.  At one time, that little peephole wasn't

even there, but we wanted to make this, again, kind of stand out to the folks opening the mail.  We have added the—the band around the paper wrapper around the forms, again, to kind of make it pop." (*Id.* at 1:285).   But these are packaging elements and are seen primarily and perhaps only by the office staff, who discard them before putting the display in a waiting room or lobby.  This packaging cannot have secondary meaning for the members of the buying public.

Flowers also testified that it was "the marketing team's decision to make tweaks and changes to the family look of [AMID's] artwork and [] materials over time." (*Id.* at 2:61, 1:284–85).  The artwork on the face of the order form changed over time but, according to Flowers, is all within the "family look."  (*Id.* at 1:284–86).  This runs counter to AMID's claim that its trade dress includes "photographs of jewelry on the face of the order form."

Both Flowers and AMID's CEO, Rick Russell, admitted that, in addition to the varying displays admitted into evidence at the preliminary-injunction hearing, there were  more variations not presented to the court.  As Russell stated, AMID has "used so many variations."  (Tr. 3:61; *see id.* at 2:79 (Plaintiff's Exhibit  23 does not show every type of AMID display); *id.* at 2:87–88 ("I don't believe that I left out any display style that we have done to show our look," but admitting that Defendant's Exhibit 31-1, showing a different display, was left out of Plaintiff's Exhibit 23, which purported to compile AMID's displays from 2009 to present); *id.* at 2:89–90 (asserting that a lucite display made for Publix was part of the "family look," but nonetheless was omitted from Plaintiff's Exhibit 23); *id.* at 3:61 (when asked if AMID had provided "all the displays that AMID has used over the last ten years," Russell testified "[p]robably not. We have used so many variations, but we do have a very core family that we have presented, yes.")).

AMID did not present evidence showing that mass-mailed countertop easel displays have

been consistent or that sufficiently consistently displays have been used for a long period.  This factor weighs against finding secondary meaning.  *Compare T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888, 905–906 (S.D. Tex. 2014) (the plaintiff established secondary meaning in part because it had used a distinctive magenta color in all its ads, displays, and all other marketing for over ten years) *with Forney Indus.*, 835 F.3d at 1254 (the plaintiff could not establish continued use with a vague description of trade dress that had changed significantly over 20 years).  AMID's varying displays over time weakens its secondary-meaning claim, whether the consumers are considered doctors' staff, doctors, or patients.

### b.    The Sales Volume

AMID presents no evidence of the sales volume associated with the various displays it claims are protected.  AMID instead cites the number of displays with the "family look" it shipped.  How many displays have been sent does not equate to the number of displays placed in doctors' offices.  Nor does it reveal the volume of associated or resulting sales to patients viewing the displays.  *See Test Masters Educ. Servs. v. Singh*, 46 F. App'x 227 (5th Cir. 2002) (failing to introduce evidence of sales or revenues weighs against finding secondary meaning).  This factor weighs against finding secondary meaning.

### c.    The Amount and Manner of Advertising

AMID points to general evidence of how many doctors' offices may have placed the direct-mailing displays AMID sent.  AMID's evidence showed that its primary advertising since 2010 in all 50 states is countertop displays.  AMID spent $1,000,000 on its marketing displays in 2016.  This evidence was not specific to a particular version of the display.  Flowers testified that she could not identify how many displays from each campaign were sent to doctors' offices.  She instead estimated

33

that 300,000 displays distributed since 2012 had this "family look," amounting to 80 percent of the displays.  (Tr. 1:286, 2:67–68).  When asked how many of any specific display AMID sent, Flowers resorted to the "family look" description and noted that "the majority of our materials that have gone out have that look and feel." (*Id.* at 2:66–67).

Despite the variety of displays—some with no facsimiles, some with no tear-off sheets, and some prominently displaying another company, One Call Alert—no AMID witness could give the number of the particular display types that AMID distributed, much less the number placed in doctors' offices.  Nor were AMID's witnesses able to state when it distributed various displays to medical professionals' offices.  Flowers did not know when Defendant's Exhibit 31-1, an easel display with the word "remove" on its corrugated cover and a black wraparound band, was distributed or how many copies AMID sent out, and could only give numbers "on our family look." (*Id.* at 2:65–66);  (*see also id.* at 2:66–67 (Flowers did not know how many copies of the display shown in Plaintiff's Exhibit 42 AMID sent out); *id.* at 2:81–82 (Flowers did not know how many of the displays shown in Plaintiff's Exhibit 23 at page 61 were mailed out); *id.* at 2:85 ("At this point I am confused because we have been talking about this display, that display, and I am talking about these in a general sense. You mentioned the CVS display, with this one in here. I consider that part of the family look. I am not saying 100,000 of those displays went out. I am talking about collectively as a whole."); *id.* at 2:87 ("I don't know the specific number."))

This testimony on the generalities of  AMID's advertising campaign does not support its trade-dress claim as to a particular type of display or even all the displays that AMID considers to share the general "family look."  *See Nola Spice Designs, L.L.C.*, 783 F.3d at 544–45 (the court discounted an affidavit stating that $594,000 had been spent on the "development and promotion and

34

expanding the use" of the claimed trade dress because the affidavit did not specify how much was spent on "development of the mascot, which may not have affected public perception of the mark"); *cf.  T-Mobile US, Inc.*, 991 F. Supp. 2d at 905–906 ("T-Mobile has prominently displayed the magenta mark in virtually every aspect of its public marketing and communications" including "particularly large blocks of magenta, on television, in print advertisements, and outdoor advertisements," and in its 70,000 stores).

The inability to provide a link between the number of displays sent and the number of displays used or the sales volume, much less specify the types of displays placed in a doctor's office or the sales from that office, also weighs against finding secondary meaning.

> ### d.    The Nature of the Use of the Mark or Trade Dress in Newspapers and Magazines

This factor is not relevant to the facts presented here.

> ### e.    The Consumer-Survey Evidence

The Fifth Circuit has "consistently expressed a preference for an objective survey of the public's perception of the mark at issue," because "survey evidence is the most direct and persuasive way of establishing secondary meaning." *Amazing Spaces*, 608 F.3d at 248.  AMID did not present survey evidence of its own.  MedicAlert did a survey and presented the results, which showed that AMID's claimed trade dress had not acquired secondary meaning.

MedicAlert presented Dr. Gary Ford, who is experienced in conducting consumer surveys. He has frequently testified as a Rule 702 witness on secondary meaning, likelihood of confusion, and trademark and trade-dress issues.  (Def. Ex. 51).  Dr. Ford designed a consumer survey to determine whether AMID's claimed trade dress had acquired secondary meaning in the minds of consumers. (Tr. 2:184–88).

The secondary-meaning survey was conducted in two phases, using two controls.  It surveyed a national sample of 674 respondents, targeting typical purchasers of MedicAlert products.  (*Id.* at 2:190–93; Def. Ex. 58).  The survey respondents were two-thirds female, with 18 percent between the ages of 18 and 34, and 38 percent between the ages of 35 and 54.  (Tr. 2:191).  The remaining 44 percent were age 55 and older.  (*Id.*).  All respondents were screened to ensure that each had purchased a medical-identification bracelet, tag, or necklace in the past two years, either for themselves or someone else, or were likely to make a purchase in the next two years.  (*Id.* at 2:192).

In the first phase of the secondary-meaning survey, Test Group 1 respondents saw an image of the AMID display shown in the original complaint, with the identifying material removed.  The Control Group 1 respondents also saw a medical-identification display for Monroe Specialty Company, with identifying material removed.  (*Id.* at 2:187–88; Def. Ex. 58).  The results: 35.3 percent of Test Group 1 and 39.8 percent of Control Group 1 respondents associated the display they saw with one company.  (Def. Ex. 63).  The net percentage of acquired secondary meaning for the AMID medical-identification jewelry display is zero percent—35.3 percent minus 39.8 percent is below 0.0 percent.  (*Id.*; Tr. 2:194–96).

The survey results also showed that 3.2 percent of Test Group 1 and 5.4 percent of Control Group 1 identified MedicAlert as the source of the display they saw.  (Tr. 2:194–96; Def. Ex. 63).  Adjusting the results for these respondents shows that adjusted perceived level of secondary meaning is 32.1 percent in Test Group 1 and 34.4 percent in Control Group 1, and that the net acquired secondary meaning for the AMID medical-identification jewelry display is zero percent.  (Tr. 2:194–96; Def. Ex. 63).  A net (after subtracting the control results) minimum of 50 percent or higher is generally accepted in Dr. Ford's field as the threshold for showing secondary meaning.  (Tr.

2:196).

In the second phase of the secondary-meaning survey, Test Group 2 respondents saw the same image as the Test Group 1 respondents, with the words "save lives" removed from the phrase "Medical IDs Save Lives."  AMID asserted that the "saves lives" phrase had acquired secondary meaning.  Control Group 2 respondents saw a medical-identification jewelry brochure for a fictitious product and company.  (*Id.* at 2:189–90).  The results showed that 41.3 percent of Test Group 2 and 41.1 percent of Control Group 2 respondents associated the display they saw with one company. (Def. Ex. 63; Tr. 2:199).  The net percentage of acquired secondary meaning for the AMID medical-identification jewelry display is close to zero percent—41.3 percent minus 41.1 percent equals 0.2 percent.  (Def. Ex. 63; Tr. 2:199).  This survey also showed that 2.7 percent of Test Group 1 respondents and 1.3 percent of Control Group 1 respondents identified MedicAlert as the source of the display they saw.  Adjusting the results for these respondents, the perceived level of  secondary meaning for AMID is 38.7 percent in Test Group 1 and 39.7 percent in Control Group 1, and the net acquired secondary meaning for the AMID medical-identification jewelry display is less than zero percent.  (Def. Ex. 63; Tr. 2: 198–99).

If the phrase "Medical IDs Save Lives!" had acquired secondary meaning, the percentage of respondents in Test Group 2 who associated the display with one company would fall compared to Test Group 1. The results show that the percentage of respondents in Test Group 2 who associated the AMID display with one company was 41.3 percent, compared to 35.3 percent in Test Group 1. The evidence did not show that the phrase "Medical IDs Save Lives!" has acquired secondary meaning.  (Def. Ex. 63; Tr. 2:198–99).

Dr. Ford designed a second survey—the "attribute and incidences" survey—to evaluate the

incidence level of AMID and MedicAlert promotional materials displayed in doctors' offices and clinics and the importance of various attributes in a doctor's decision to display these materials. (Tr. 2:184–188). This survey asked doctors who displayed advertising or promotional literature in their offices what role certain attributes played in determining what materials to display. (Def. Ex. 64; Tr. 2:211–12). This survey was intended to show whether the displays had acquired secondary meaning with doctors as the consumer, and whether doctors use different criteria than trade-dress appearance in choosing what promotional materials to display. (Def. Ex. 65; Tr. 2:214–17). Although the doctors are a type of "gatekeeper" and recommenders of medical-identification jewelry rather than direct consumers, this additional survey helps ensure a more thorough analysis.

The attribute and incidences survey measured the importance of eight attributes in the decision to display advertising materials for products or services in doctors' offices. The survey was conducted with a representative sample of 253 doctors, who were screened to ensure that their offices display product advertising and that they participated in the decision to display these materials. (Tr. 2:201–202, 2:214; Def. Exs. 61–62). The survey asked the doctors to measure certain attributes on a scale of 1 to 7, with 1 meaning "the attribute is not at all important" and 7 meaning "the attribute is extremely important." (Def. Ex. 62). From most important to least important, the results showed the mean "importance": relevance of the company's product or service to patients (5.82); company reputation among health care professionals (5.25); appearance of the advertising or promotional literature or materials (4.90); brand recognition of company by health-care professionals (4.62); relationship with company's sales representative (4.24); product or service is prominent in national or local news (3.86); the company is a nonprofit or governmental organization (3.70); and compensation or commission received from the company (2.94). (Def. Ex. 64, Table 2;

Tr. 2:211–12).  Three of the top four attributes in the decision to display advertising or promotional literature or materials for products or services that can be purchased by patients relate to the relevance, reputation, and recognition of the products sold.  (Def. Ex. 64, Table 2; Tr. 2:211–12).

This survey found that 23.3 percent of the doctor-respondents currently displayed advertising or promotional literature from both AMID and MedicAlert; 58.5 percent did not currently display advertising or promotional literature from either AMID or MedicAlert; 8.7 percent currently displayed advertising or promotional literature from AMID but not from MedicAlert; and 9.5 percent of respondents currently displayed advertising or promotional literature from MedicAlert but not from AMID.  (Def. Ex. 65; Tr. 2:214–17).  There is no evidence from this survey that MedicAlert's marketing materials are replacing AMID's or that AMID's marketing materials are replacing MedicAlert's.  Instead, it appears that if doctors decide to display materials from either AMID or MedicAlert and receive materials in the mail from the other, they are likely to display both rather than display one or the other.  (Def. Ex. 65).

AMID presented the expert testimony of Sarah Butler.  AMID retained Butler to review Dr. Ford's survey and report.  She did not do a secondary-meaning survey herself.  (Tr. 2:134; Pl. Ex. 28).  Butler criticized using Dr. Ford's use of the Monroe Specialty display for Control Group 1 in the first survey.   "One [reason] is that it appears that the control version actually has source-identifying characteristics for consumers, and I think part of the reason that that's happening is because consumers aren't really evaluating the displays." (Tr. 2:142).  Although Butler questioned using the Monroe Specialty display as a control,  Russell, AMID's CEO, testified that Monroe Specialty has not been a significant competitor for years. (*Id.* at 3:46).  Dr. Ford explained that if the survey respondents associated the level of secondary meaning with Monroe Specialty because it was

well-known, there should have been a lower level of secondary meaning in Control Group 2 as compared to Control Group 1. (*Id.* at 2:199). Instead, the opposite occurred. A higher percentage of respondents associated secondary meaning with the fictitious display than with Monroe Specialty. (*Id.*; Def. Ex. 63). The record fails to support AMID's critique of this aspect of Dr. Ford's survey.

Butler also criticized Dr. Ford's secondary-meaning survey because it surveyed the patient-consumers who saw only the countertop display without the packaging elements that the doctors' staff removed. (Tr. 2:135; Pl. Ex. 28). The case law recognizes that it is important to survey the displays as the purchasing consumer sees them. *Bonito Boats, Inc.*, 489 U.S. at 157; *Scott Fetzer Co.*, 381 F.3d at 485–86. In addition, the second survey considered doctors as consumers, despite the lack of evidence as to how many doctors actually see the displays when they arrive in the mail, before they are opened and the outer wrapping removed; how many doctors play a role in deciding whether to place the displays in the waiting room or lobby and whether these doctors make the decision before or after the wrapping is removed; or how many doctors recommend that patients buy medical-identification jewelry. This argument does not reduce the persuasive force of Dr. Ford's surveys.

Butler also criticized the population Dr. Ford chose to survey. She concluded that the first survey was underinclusive because it targeted only potential patient-purchasers of the medical-identification products and did not include doctors, front-office staff, pharmacists, or other "gatekeepers" who make decisions about whether to put the easel display where the patient-purchasers can see them. (Tr. 2:137–39; Pl. Ex. 28). The authorities addressing secondary-meaning surveys reject or disfavor such a broad approach. "One of the most scientific methods of determining the mental associations of the relevant purchaser class is to conduct a survey of the purchasers themselves." 1 McCarthy, *supra*, § 15:42. "[T]o establish a secondary meaning, the

survey introduced by a litigant must prove that buyers associate the designation with it, not with another company and certainly not associate it with the opponent in the case." *Id.*; *see id.* at n.1 (citing Bednall, Gendall, Hoek and Downes, *Color, Champagne and Trademark Secondary Meaning Surveys*, 102 TRADEMARK REP. 967, 999 (2012) ("It is proposed that upon showing the stimulus that the interviewee be asked immediately if he or she can identify the source. This matches a real life shopping situation in which a consumer confronts a display of products and spontaneously identifies the brand. 'Here is some wine. Does this wine identity any particular brands, products or companies to you or not?'"). In this case, the first survey was properly aimed at the patient-purchasers of medical-identification jewelry, the relevant consumers for the secondary-meaning inquiry. Out of an abundance of caution, the second survey was aimed at the doctors to whose offices the displays were sent.

The second control used in the first survey was a fictitious company. Butler criticized this control because what the respondents saw had a "very large 1-800 number" displayed "right in the middle." (Tr. 2:145–46). Dr. Ford responded to this criticism at the hearing. He testified that he would not have included the toll-free number on the control display if he had to repeat the survey. (*Id.* at 2:189–90). But Dr. Ford also testified that he did not believe the toll-free number "made much of a difference at all," because only four people mentioned the telephone number in the part of their response explaining why they said that the display came from a single source. (*Id.* at 2:190).

In sum, Dr. Ford explained convincingly that the secondary-meaning surveys clearly showed that AMID's claimed trade dress in its display and the phrase "save lives" have not acquired secondary meaning among either the most relevant purchasers or the doctors in the offices receiving the displays. The court finds that Dr. Ford's testimony was credible and that the surveys he

conducted and explained yielded reliable and helpful results. Butler's criticisms, by contrast, were based on approaches that courts have rejected or disfavored as overly broad or were inconsistent with the facts established in the record.

This factor weighs against finding that AMID's claimed trade dress has acquired secondary meaning. *See Test Masters Educ. Servs.*, 46 F. App'x at 227 (the lack of survey evidence "substantially diminishe[d]" the plaintiff's secondary meaning claim).

### f.      Direct Consumer Testimony

AMID did not present evidence on this factor.

### g.      MedicAlert's Intent in Selecting the Trade Dress it Used

Courts have recognized that "evidence of intentional copying shows the strong secondary meaning of [a product] because 'there is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence.'" *Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1239 (6th Cir. 1991) (quoting *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir. 1960)). Courts also recognize that evidence of a defendant's intent to copy is more relevant to analyzing whether protected trade dress has been infringed than to whether the trade dress is protected in the first place. *Berg v. Symons*, 393 F. Supp. 2d 525, 554 (S.D. Tex. 2005) (citing *Sno-Wizard Mfg., Inc. v. Eisemann Prod. Co.*, 791 F.2d 423, 428 (5th Cir. 1986); *Blue Bell Bio–Medical v. Cin–Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989)).

AMID presented circumstantial evidence on intent. Justin Noland left AMID in May 2014 and began working at MedicAlert in June. Almost a year later, in spring 2015, MedicAlert began using a new display for distribution to health-care professionals that included samples of its medical-identification products. (Def. Ex. 10; Tr. 3:106). MedicAlert mailed around 50,000 displays to

42

doctors' offices.  (Tr. 1:104, 3:106).  Before the spring 2015 mailing, MedicAlert's most recent mass mailing had been in 2009.  (Tr. 3:107).  MedicAlert had sent mass mailings of brochures and tear-off pads, as well as easel displays, to doctors for 28 years before the six-year hiatus from 2009 to 2015. (Defs Ex. 4, 17, 18-1, 19; Tr. 3:102–105, 3:109–110).

The display MedicAlert sent in 2009 included brochures that looked much different from what MedicAlert sent after it hired Noland.  (*Compare* Def. Ex. 17 *with* Def. Ex. 32).  In February 2016, MedicAlert mailed out about 25,000 displays designed for the Alzheimer Association.  (Pl. Ex. 32; Tr. 1:151–52).  In spring 2016—before this lawsuit was filed—MedicAlert mailed health-care professionals about 75,000 of the display shown in Defendant's Exhibit 12.  (Tr. 3:110, 3:124–25). At the same time, the adverse inference properly drawn from Noland's departure from AMID and subsequent MedicAlert hiring is reduced because MedicAlert did mass-mailing campaigns to doctors' offices long before Noland's arrival, before AMID began its direct mailing, and even before AMID existed.

The timing of Noland's hiring and MedicAlert's resumption of a  mass-mailing campaign after a six-year hiatus fails to rise to the level courts have found important in evaluating a defendant's intent in a secondary-meaning analysis.  *Cf. Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.*, 765 F. Supp. 2d 884, 899 (S.D. Tex. 2011) (denying summary judgment because a reasonable jury could find secondary meaning when the defendant told its designer "that it was looking to create a bottle that was similar to the [plaintiff's] bottle," though it wanted to improve upon the grip and handle of that bottle, and that the "dual handle jug should match the [plaintiff's] Jug," adding, "[p]lease make it match"); *Berg*, 393 F. Supp. 2d at 554 (the intent to copy had little probative value after a business divorce because the defendant testified that "she continued to produce jewelry that

looked like the pieces [the plaintiff] designed because she thought she had the legal right to do so and because it was the only business she had known"). This factor weighs in favor of finding secondary meaning, but the probative value is limited by MedicAlert's long prior history of unsolicited mass-mailings of countertop easel displays to doctors' offices.

### h.      Weighing the Factors

AMID presented no evidence on how long it used specific displays, the amount and manner of advertising, or the results. Instead, AMID generally asserted a "family look" of displays that was protected. AMID presented no evidence of sales volume, consumer surveys, or direct consumer testimony, either from doctors or their patients. The only evidence supporting secondary meaning is the timing of Noland's hiring and MedicAlert's resumption of mailing displays to doctors' offices. MedicAlert, by contrast, introduced reliable evidence from the surveys Dr. Ford conducted that AMID's "family look" for its displays had not acquired secondary meaning. Considering all of the factors, the court cannot conclude on this record that AMID's claimed trade dress has acquired secondary meaning.

Because the court has found that AMID has not shown a substantial likelihood of succeeding in proving that its claimed trade dress is inherently distinctive or has acquired secondary meaning, AMID has not shown that it is likely to succeed on the merits of its trade-dress infringement claim. *Wal-Mart Stores*, 529 U.S. at 210.

### 3.      Functionality

One additional problem with AMID's claims deserves note—the functionality of the trade dress AMID asserts is protected. The Lanham Act protects only nonfunctional distinctive trade dress, a limit that "serves to assure that competition will not be stifled by the exhaustion of a limited

44

number of trade dresses." *Two Pesos*, 505 U.S. at 775.  The traditional test of functionality is whether the product feature "is essential to the use or purpose of the article or if it affects the cost or quality of an article."   *TrafFix*, 532 U.S. at 32 (citing *Qualitex Co.*, 514 U.S. at 165) (internal quotation marks omitted).  "Under this traditional definition, if a product feature is 'the reason the device works,' then the feature is functional.  The availability of alternative designs is irrelevant." *Eppendorf Netheler Hinz GmbH v. Ritter GmbH*, 289 F.3d 351, 355 (5th Cir. 2002) (quoting *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 33–34 (2001)).  The word "essential" is a term of art; "[a] feature is essential to the use or purpose of a product if it serves any significant function other than to distinguish a firm's goods or identify their source."  *Poly–Am., L.P. v. Stego Indus.*, L.L.C., Civ No. 3:08–cv–2224, 2011 WL 3206687, at *10 (N.D. Tex. July 27, 2011) (citing *Qualitex*, 514 U.S. at 165–66).  *TrafFix* recognized a second test for functionality: "a functional feature is one the 'exclusive use of which would put competitors at a significant non-reputation-related disadvantage.'"  *TrafFix*, 532 U.S. at 32 (quoting *Qualitex*, 514 U.S. at 165).  However, "[w]here the design is functional under the [traditional] formulation there is no need to proceed further to consider if there is a competitive necessity for the feature."  *Id.* at 33.  It is AMID's burden to show that its claimed trade dress is not functional.  *Eppendorf-Netheler-Hinz GMBH*, 289 F.3d at 355 (citing 15 U.S.C. § 1125(a)(3)) .

AMID argues that its trade dress is nonfunctional and therefore protected because the display could have been "designed in thousands of other ways, with elements in infinite combinations." (Docket Entry No. 49 at 30).  This argument ignores the "traditional test," the "primary test for functionality," outlined in *TrafFix*.  *See Eppendorf-Netheler-Hinz GMBH*, 289 F.3d at 355–57 (citing *TrafFix*, 532 U.S. at 33).  In *TrafFix*, the Court found that the dual-spring design on a wind-resistant

road sign was functional because the design "provides a unique and useful mechanism to resist the force of the wind." 532 U.S. at 33.  The Court rejected the argument that the springs were nonfunctional because a competitor could use three or four springs to serve the same purpose.  *Id.* As a result, "[t]here is no need . . . to engage, as did the Court of Appeals, in speculation about other design possibilities, such as using three or four springs which might serve the same purpose . . . . The dual-spring design is not an arbitrary flourish in the configuration of [the road sign]; it is the reason the device works. Other designs need not be attempted."  *Id.* at 33–34; *see Eppendorf-Netheler-Hinz GMBH*, 289 F.3d at 358 ("Although alternative designs are relevant to the utilitarian test of functionality, alternative designs are not germane to the traditional test for functionality.").  Following this guidance, the Fifth Circuit rejected a plaintiff's argument that its design was nonfunctional because alternative designs were available.  *Eppendorf-Netheler-Hinz GMBH*, 289 F.3d at 357 ("Accordingly, the design features for which [the plaintiff] seeks trade dress rights are functional if they are essential to the use or purpose of the [trade dress] or affect the cost or quality of the [trade dress].  The availability of alternative designs is irrelevant.").

Under the traditional test for functionality, AMID has failed to show that its displays are not "essential to the use or purpose" of the trade dress and do not affect the "cost or quality" of the trade dress.  *See TrafFix*, 532 U.S. at 32.  There is evidence of functionality because displays using an easel design and attached pad with tear-off sheets are covered by utility patents and are commonly used.[9]

---

[9] MedicAlert did not introduce the patents into evidence during the preliminary injunction hearing. AMID moves to strike the patents attached to the posthearing findings of fact and conclusions of law. (Docket Entry No. 52).  As a public record of a federal agency, this is evidence that "may be judicially noticed." *Massachusetts v. Westcott*, 431 U.S. 322, 323 n.2 (1977).  AMID cannot claim unfair surprise from this evidence because the patents were attached as an exhibit to MedicAlert's response to the preliminary injunction motion. (Docket Entry No. 14 at 13).  And AMID sought to include affidavits attached as exhibits to the preliminary injunction motion, while seeking to exclude patents that were attached as exhibits to the response.  AMID's motion to strike is denied.

(*See* Def. Ex. 66 (compiling utility patents related to various displays)); *see also TrafFix*, 532 U.S. at 29–30 (a utility patent is "strong evidence" that the features claimed are functional; features are statutorily deemed functional "until proved otherwise by the party seeking trade dress protection."). Attaching sample products, like AMID's medical-identification jewelry, to countertop displays is also commonplace.  The placement of attached samples on the displays is also functional.  If a sample is included, it must be attached to a place on the display so the display does not topple over.

Nor can AMID argue that the combination of functional elements somehow adds up to a nonfunctional whole.  "'[I]n order to receive trade dress protection for the overall combination of functional features, those features must be configured in an arbitrary, fanciful, or distinctive way. . . . In other words, where individual functional components are combined in a nonarbitrary manner to perform an overall function, the producer cannot claim that the overall trade dress is non-functional.'"  *Clearline Techs. Ltd. v. Cooper B-Line, Inc.*, 948 F. Supp. 2d 691, 701 (S.D. Tex. 2013) (quoting *Antioch Co. v. W. Trimming Corp.*, 347 F.3d 150, 158 (6th Cir. 2003)).  AMID's displays serve significant functions other than identifying the source.

Even if AMID had established that its trade dress was inherently distinctive or had acquired secondary meaning, AMID did not show a substantial likelihood of proving that its claimed trade dress was nonfunctional.  *See Eppendorf-Netheler-Hinz GMBH*, 289 F.3d at 358.  This is yet another reason to find that AMID's asserted trade dress is not protectable under the Lanham Act.

### 4.    Summary on AMID's Claim of Protected Trade Dress

The court finds that AMID has failed to show a substantial likelihood of success on its claim that its asserted trade dress is protected.  The record does not show that the trade dress AMID claims is inherently distinctive, has acquired secondary meaning, or is nonfunctional.  Because AMID has

not shown that it owns protected trade dress, the court need not consider whether that claimed trade dress was infringed.  *See Smack Apparel*, 550 F.3d at 478 ("Once a plaintiff shows ownership in a protectable trademark, he must next show that the defendant's use of the mark creates a likelihood of confusion in the minds of potential customers as to the source, affiliation, or sponsorship of the product at issue.").

### 5.    An Additional Problem: Injunctive Relief and Irreparable Harm

Because AMID has not shown a likelihood of success on the merits of its trade-dress protection claim, and therefore cannot show a likelihood of success on its infringement claim, this court cannot grant the preliminary injunction AMID seeks.  *See Texans for Free Enter.*, 732 F.3d at 537.  The court notes one additional obstacle AMID would face even if it had shown a substantial likelihood of success on the merits.  AMID's claim for a substantial threat of irreparable injury if MedicAlert continues to mail displays to doctors' offices is diminished by its delays in seeking relief.

"Irreparable injury connotes ongoing serious harm that calls for prompt action by the moving party before it can ask the court for an immediate injunction pending trial."  5 McCarthy, *supra*, § 30.48.50.  "[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief. Evidence of an undue delay in bringing suit may be sufficient to rebut the presumption of irreparable harm."  *Wireless Agents, L.L.C. v. T–Mobile USA, Inc.*, Civ. No. 3:05–cv–0094, 2006 WL 1540587, at *4 (N.D. Tex. June 6, 2006); *accord* 5 McCarthy, *supra*, § 30.48.50 (In some cases, a delay by plaintiff in filing suit for infringement or in seeking a preliminary injunction "tends to neutralize any presumption that infringement alone will cause

irreparable harm pending trial.").

AMID was aware of the MedicAlert displays at issue no later than June 2015.  (Tr. 2:11).

Russell thought that MedicAlert's display was "strikingly similar" to AMID's displays.  (*Id.* at 3:28).

Russell consulted the lawyer AMID had used for trademark matters in the past.  (*Id.* at 2:36–37, 2:39,

3:73).  He also hired a forensic expert to determine what information, if any, Noland had taken from

AMID when he left.  (*Id.* at 3:71–72).  Russell made a "formal complaint" to MedicAlert in his July

14, 2015 letter alleging infringement.  (Pl. Ex. 30).  Russell's letter stated that AMID was "seeing

specific examples in the marketplace" of a MedicAlert display that Russell characterized as a "virtual

carbon copy" of AMID's.  (*Id.*).  Russell also wrote that Noland had breached his employment

agreement with AMID by taking intellectual property when he left AMID and went to work at

MedicAlert.  (*Id.*).

Russell believed in July 2015 that MedicAlert's display was "an extreme knockoff" and had

"great concerns about the use of those [displays] in the marketplace."  (Tr. 3:35).  AMID ordered a

display from MedicAlert and received it in late July 2015.  (*Id.* at 2:34).  Russell sent Leslie an email

on July 29, 2015, reurging his concerns about Noland's employment at MedicAlert and with the

display.  "[O]ur concerns go beyond the non-compete violation itself.  It is compounded by the taking

and immediately applying of methods, designs, artwork, taglines, etc. developed here by persons

other than himself.  While much of this is not trademarked or protected formally, it is certainly in a

gray area from a legal standpoint.  But in the ethical realm, most everyone I've mentioned this to

outside our organization, reacts that they've not often seen anything so blatant."  (Def. Ex. 25).

Leslie responded to Russell's July 29, 2015 email by stating that MedicAlert would not

terminate Noland's employment because his noncompete had expired, and assuring Russell that

MedicAlert would "remain mindful of all the operating boundaries concerning marketing materials between our two companies." (Def. Ex. 26). Russell in turn acknowledged that it "sound[ed] like the matter is closed in [Leslie's] mind," but stating that Russell might "come back to [Leslie] with some final thoughts." (Def. Ex. 27).

AMID's 2015 correspondence with MedicAlert did not ask it to stop distributing the displays or to remove the display from its website. Instead, in three communications to MedicAlert, AMID pursued a partnership or other business relationship with MedicAlert. In his first email to MedicAlert on July 6, 2015, despite knowing that MedicAlert had a similar display on its website, Russell addressed only the idea of a "business combination" with MedicAlert. (Def. Ex. 22). On September 4, 2015, after Leslie's response to Russell's infringement concerns, Russell again wrote Leslie proposing another "possible business opportunity." (Def. Ex. 27). Finally, on January 6, 2016, AMID received a photo of one of MedicAlert's displays in an Austin doctor's office. (Tr. 2:13, 3:89). That same afternoon, Russell wrote Leslie with yet another proposal for a business combination. Russell did not mention the issue of the MedicAlert display. (*Id.* at 3:89–90; Def. Ex. 28). At the hearing, when asked about his January 6 letter to Leslie, Russell explained that his "desire was to do anything possible—everything possible, to avoid what is happening here now, with the desire to open some line of communication with Mr. Leslie." (*Id.* at 3:90). Despite the fact that no other line of communication appeared to exist and despite knowing of Noland's employment with MedicAlert and MedicAlert's displays, it took almost another five months for AMID to file suit. Even then, AMID did not seek a prompt hearing, instead asking for a preliminary injunction "no sooner than mid August." (Docket Entry No. 14, Ex. 22).

AMID's delay undermines its assertion that it suffered irreparable injury from MedicAlert's mass mailings to doctors' offices. AMID knew of MedicAlert's displays in June 2015 and Noland's

employment, and knew a display was in an Austin doctor's office in January 2016.  AMID did not

ask MedicAlert to stop sending displays.  AMID did not file suit until late April 2016, and then

delayed the preliminary injunction hearing until August.  *See also Tough Traveler, Ltd. v. Outbound*

*Prod.*, 60 F.3d 964, 968 (2d Cir. 1995) (vacating a preliminary injunction when the movant waited

four months to seek relief after filing suit); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir.

1985) (a ten-week delay in seeking an injunction for trademark infringement undercut the claim of

irreparable harm); *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975)

(affirming the district court's denial of temporary injunctive relief when the movant, among other

things, delayed three months in making its request).  Courts are hesitant to "manufacture a sense of

urgency that is not supported by plaintiff's own conduct."  *Krueger Intern., Inc. v. Nightingale Inc*.,

915 F. Supp. 595, 613 (S.D. N.Y. 1996) (Sotomayor, J.).

AMID's delay does not preclude relief, but it does weigh against finding a substantial threat

that AMID would be irreparably harmed, a necessary element for the injunctive relief it seeks.

### B.    The Copyright-Infringement Claim

AMID's copyright registration relates to the transmittal letter that introduces a healthcare

professional to AMID's marketing materials.  (Pl. Ex. 2).  The cover letter that AMID sends with the

marketing display is inside the easel's cellophane wrapping.  The letter is the first thing a healthcare

professional sees on opening the display package.  MedicAlert also sends a letter enclosed in the

package with its display.  (Def. Ex. 11).  AMID claims that MedicAlert's letter infringes its copyright

and seeks a preliminary injunction prohibiting continued use.

To show copyright infringement, AMID must show both (1) ownership of the copyright

material, which neither party disputes, and (2) copying by MedicAlert.  *Alcatel USA, Inc. v. DGI*

*Technologies, Inc.*, 166 F.3d 772, 790 (5th Cir. 1999).  A copy is legally actionable if the alleged

infringer used the copyrighted material to create his own work, and substantial similarity exists between the two works. *Id.* "A side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as substantially similar." *General Universal Systems, Inc. v. Lee*, 379 F.3d 131, 142 (5th Cir. 2004). Although the standard is "of necessity vague," infringement exists if an "ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Stutts v. Texas Saltwater Fishing Magazine, Inc*., Civ. No. 6:13-cv-10, 2014 WL 1572736, at *3 (S.D. Tex. Apr. 18, 2014) (Costa, J.) (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960)).

A side-by-side review of the two letters makes their similarities obvious. (*See* Pl. Ex. 11) (showing the MedicAlert and AMID letters side-by-side); *see General Universal Sys.*, 379 F.3d at 142. The bottom text of both letters is virtually identical:

AMID:

To assist you when educating your patients on the importance of medical IDs, we are offering a complimentary engraved medical ID to all healthcare professionals. To obtain your free medical ID teaching sample, visit www.IdentifyYourself.com/HCPID for details.

MedicAlert:

To assist you when educating your patients on the importance of medical IDs, we are offering a complimentary engraved medical ID to all healthcare professionals. To obtain your free medical ID teaching sample, email marketing@medicalert.org for details.

The overall look and other content of both letters is alike as well.

Copyright infringement requires actual copying, not just "mere coincidental similarity or similarity caused by copying from a similar source." 1 McCarthy, *supra*, § 6:24. "Copying is usually proven by circumstantial evidence of access to plaintiff's work coupled with a strong similarity of the

product labels." *Id.*  The fact and timing of Noland's resignation from AMID and subsequent hiring by MedicAlert are relevant here.  While MedicAlert had a long history of using displays in its marketing campaigns up to 2009, MedicAlert has presented no evidence that it used a letter until the mailings sent after Noland arrived.  AMID has shown its ownership of copyrighted material and copying by MedicAlert.  AMID has shown a likelihood of success on the elements of its copyright-infringement claim.  *Alcatel USA, Inc.*, 166 F.3d at 790.

To get an injunction, however, AMID must also show a substantial threat of irreparable harm, which must be based on future harm arising from future activity if not enjoined.  Courts in the Fifth Circuit do not presume irreparable harm after a plaintiff has shown a reasonable likelihood of success on the merits of a copyright-infringement claim.  *Joseph Paul Corp. v. Trademark Custom Homes, Inc.*, Civ No. 3:16-cv-1651, 2016 WL 4944370, at *12 (N.D. Tex. Sept. 16, 2016) (citing *Plains Cotton Co-op. Ass'n of Lubbock, Texas v. Goodpasture Computer Serv., Inc.*, 807 F.2d 1256, 1261 (5th Cir. 1987)).

The injunction AMID seeks is undercut both by its delay in filing suit and by developments since this dispute arose.  MedicAlert has stopped using the letter that was similar to AMID's and replaced it with another letter that is significantly different.  (Def. Ex. 70; Tr. 2:71–73).  This second letter does not infringe AMID's copyright.  (*See* Def. Ex. 16).

"The cessation of infringing activity does not affect the determination of liability, but it may make an injunction unnecessary."  *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 198 (5th Cir. 1998) (citing *M–F–G Corp. v. EMRA Corp.*, 817 F.2d 410, 411 (7th Cir.1987); *Blisscraft v. United Plastics Co.*, 294 F.2d 694, 702 (2d Cir. 1961) (finding it necessary to fully consider the liability issue and issue an injunction despite the defendant's cessation of infringing use); *Esquire, Inc. v. Esquire Slipper Mfg. Co.*, 243 F.2d 540, 542, 546 (1st Cir. 1957) (reversing a decision dismissing

53

an action based on the defendant's promise to cease infringing conduct because the plaintiff was entitled to an enforceable judgment)).  AMID has not presented evidence or argument showing that irreparable injury will occur if MedicAlert is not enjoined from using the letter that it no longer uses.[10] AMID's counsel noted in closing argument that there is a "causation issue" with the copyright-infringement claim because AMID could not establish "the kind of damages" that might result from that infringement.  (Tr. 3:139).

The delay issue is present here as well.  Flowers ordered and received a MedicAlert display in the summer of 2015 that included the infringing letter.  AMID did not file suit until late April 2016. With no evidence or argument of irreparable harm absent an injunction, MedicAlert's revision of its letter that avoids infringement, and AMID's delay in filing suit, the court cannot grant the "extraordinary remedy" of the preliminary injunction AMID seeks.  *Texans for Free Enter.*, 732 F.3d at 536.

## IV.    The Motion to Dismiss[11]

MedicAlert moved to dismiss AMID's claims for breach of the covenant of good faith and fair dealing, civil conspiracy, and unfair competition by misappropriation.  (Docket Entry No. 24).  At the preliminary-injunction hearing, AMID voluntarily dismissed two of the disputed claims—breach of the covenant of good faith and fair dealing and civil conspiracy.  (Tr. 3:5).  The Texas common-law claim for unfair competition by misappropriation remains.

---

[10]   In its posthearing proposed findings of fact and conclusions of law, after arguing that it had a substantial likelihood of success on its copyright infringement claim, AMID stated: "Applying the other factors for preliminary injunctive relief, requires an injunction against the use of the letter in the Medic Alert materials."  (Docket Entry No. 49 at 38).

[11]   The court denies MedicAlert's first motion to dismiss the first complaint as moot in light of AMID's filing of an amended complaint. (Docket Entry No. 15).

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008).  In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court elaborated on the pleading standards discussed in *Twombly*.  The Court explained that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).  *Iqbal* explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).

MedicAlert contends that the Texas Uniform Trade Secrets Act, or TUTSA, preempts AMID's common-law claim for unfair competition by misappropriation.  (Docket Entry No. 24 at 8).  TUTSA "displaces conflicting tort . . . law of this state providing civil remedies for misappropriation of a trade secret."  TEX. CIV. PRAC. & REM. CODE §134A.007(a).  The statute details limits on preemption: "(b) This chapter does not affect . . . (2) other civil remedies that are not based upon misappropriation of trade secret."  *Id.* at § 134A.007(b)(2).  AMID contends that because its unfair-competition-by-misappropriation claim does not require proof of secrecy, TUTSA does not preempt its claim.  *See U.S. Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 218 (Tex. App.—Waco 1993, writ denied).

"A claim is not preempted if the plaintiff is able to show the claim is based on facts unrelated

to the misappropriation of the trade secret." *360 Mortgage Grp., LLC v. Homebridge Fin. Servs., Inc.*, 2016 WL 900577, at \*6–\*7 (W.D. Tex. March 2, 2016) (citing *Coulter Corp. v. Leinert*, 869 F. Supp. 732, 734 (E.D. Mo. 1994) (analyzing an identical provision of the Uniform Trade Secret Act and explaining that "the issue becomes whether allegations of trade secret misappropriation alone comprise the underlying wrong; if so the cause of action is barred")).

There are few Texas cases analyzing TUTSA preemption in this context, but other cases analyzing identical provisions of the applicable Uniform Trade Secrets Acts are instructive.  In *Coulter Corporation*, 869 F. Supp. at 735, the court found that an unfair-competition claim was preempted because the only wrong alleged by the plaintiff "center[ed] on misappropriation of trade secrets."  The court allowed other tort claims to go forward, however, because preemption "does not apply to duties imposed by law that are not dependent upon the existence of competitively significant secret information."  *Id.*  In *Smithfield Ham*, the plaintiffs claimed tortious interference with a contract in addition to misappropriation of a trade secret.  *Smithfield Ham & Prod. Co. v. Portion Pac, Inc*., 905 F. Supp. 346, 349 (E.D. Va. 1995).  The court allowed the tortious-interference claim to proceed because the plaintiff "could lose its misappropriation claim yet still recover for tortious interference." *Id.* at 349–50.  The *Smithfield Ham* court helpfully explained that "[t]he plain language of the preemption provision indicates that the law was intended to prevent inconsistent theories of relief for the same underlying harm by eliminating alternative theories of common law recovery which are premised on the misappropriation of a trade secret."  905 F. Supp. at 348.  Similarly, in *Hutchison*, the plaintiffs claimed that the defendant had misappropriated a trade secret for skinless fried chicken and that "this resulted in . . . unfair competition."  *Hutchison v. KFC Corp.*, 809 F.Supp. 68 (D. Nev.1992) (interpreting an identical preemption provision under the Nevada UTSA).  The court found all these claims preempted as "duplicative" of the misappropriation claim.  *Id.*

AMID argues that because its claim for unfair competition by misappropriation has different legal elements than its TUTSA claim, the unfair-competition claim is preempted. "Preemption, however, is not avoided simply because a claim requires different elements of proof than a [Uniform Trade Secrets Act] claim." *Secure Energy, Inc. v. Coal Synthetics, LLC*, Civ. No. 4:08-cv-1719, 2010 WL 1691454, at *3 (E.D. Mo. Apr. 27, 2010). The focus is on whether the facts relied on to support the unfair-competition claim differ from those supporting the TUTSA claim. *Id.* (citing *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1146 (Fed. Cir. 2004) (whether Connecticut's Uniform Trade Secret Act preempted a fraud claim depended on whether different facts supported the misappropriation claim)).

In *AWP, Inc. v. Commonwealth Excavating, Inc.*, Civ. No. 5:13-cv-031, 2013 WL 3830500 (W.D. Va. July 24, 2013), the plaintiffs alleged a statutory trade-secret claim as well as common-law conspiracy, tortious interference, and unjust-enrichment claims. *Id.* at *6. The court found that the defendant prematurely raised its preemption argument because the plaintiff had not proven its entitlement to relief under the Uniform Trade Secrets Act. *Id.* at *7 (citing *Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co., Inc.*, 191 F. Supp. 2d 652, 659 (E.D. Va. 2002) ("unless it can be clearly discerned that the information in question constitutes a trade secret, the Court cannot dismiss alternative theories of relief as preempted by the VUTSA.")). "Where courts have found preemption on a motion to dismiss, they repeatedly establish that the information in issue as alleged constitutes trade secrets before reaching the preemption question." *Stone Castle Fin., Inc.*, 191 F. Supp. 2d at 659 (citing *S & S Computers*, 2001 WL 515260, at *2–*3 (allegations that the information met the elements of a trade secret, "if proven, are sufficient to establish its proprietary information as a trade secret under VUTSA" before the court analyzed whether the claim for breach of fiduciary duty was preempted)); *On-Line Techs.*, 141 F. Supp. 2d at 261 (dismissing an unjust-enrichment claim because

57

"OLT has plead[ed] nothing that is not a protectable trade secret"); *Frantz v. Johnson*, 999 P.2d 351, 358 n.3 (Nev. 2000) ("There may be future instances where a plaintiff will be able to assert tort claims, including intentional interference with prospective advantage . . . that do not depend on the information at issue being deemed a trade secret, and are therefore barred by the UTSA"); *Thomas Betts Corp. v. Panduit Corp.*, 108 F.Supp.2d 968, 972 (N.D. Ill.2000) (a breach of fiduciary duty claim was preempted because "[t]he evidence is substantial that the confidential sales data and related information" allegedly taken "constitute trade secrets under the statute").

AMID essentially pleaded alternative theories of relief.  It sought relief on the theory that Noland misappropriated information protected as trade secrets, and alternatively under the theory that the misappropriated information was not a trade secret but was confidential.  The difference is that in its common-law unfair-competition claim, AMID did not allege that the information was protected as trade secrets.  Instead, AMID alleged that it "is the owner of valuable business methods, marketing plans, confidential know-how and proprietary information," which MedicAlert and Noland "misappropriated, use and disclosed."  (Docket Entry No. 21 at ¶¶ 100–101).  AMID's TUTSA claim is based on the allegation that the misappropriated information was protected as trade secrets.  (*Id.* at ¶¶ 92–97).  MedicAlert denies that the information at issue is a trade secret, but AMID could recover on its tort claim without proving that the information is protected as trade secrets.  *AWP, Inc.*, 2013 WL 3830500, at *7; *Stone Castle Fin., Inc.*, 191 F. Supp. at 659.  MedicAlert's motion to dismiss on the basis of TUTSA preemption is denied.

**V.     Conclusions of Law**

The court enters the following conclusions of law:

**A.     Trade-Dress Infringement**

1.     AMID failed to show a substantial likelihood of success on the merits of its

trade-dress infringement claim under the Lanham Act.

    a.    AMID's trade dress is not eligible for protection under the Lanham Act.

        i.    AMID has not shown that its trade dress is inherently distinctive.

        ii.    AMID has not shown that its trade dress has acquired secondary meaning.

        iii.    AMID has not shown that its trade dress is nonfunctional.

2.    AMID failed to show a substantial likelihood of irreparable injury to AMID without adequate legal remedy if the injunction does not issue.

**B.    Copyright Infringement**

1.    AMID showed a substantial likelihood of success on the merits of its copyright-infringement claim.

    a.    AMID owns the copyright to the letter.

    b.    AMID has shown that MedicAlert copied and used the letter.

2.    AMID failed to show a substantial likelihood of irreparable injury without an adequate legal remedy if the injunction did not issue.

**C.    TUTSA Preemption of AMID's Unfair-Competition Claim**

1.    AMID's common-law claim for unfair competition by misappropriation is not preempted by TUTSA because AMID could recover on its tort claim without proving that the information is protected as trade secrets.

This court denies AMID's application for a preliminary injunction against MedicAlert's use of its claimed trade dress.  The court also denies AMID's application for a preliminary injunction against MedicAlert's use of the copyrighted letter.  The court denies MedicAlert's motion to dismiss the unfair-competition-by-misappropriation claim.

**VI.    Conclusion and Order Setting Hearing**

The court denies AMID's motion for a preliminary injunction on its trade-dress infringement

and copyright-infringement claims.  (Docket Entry No. 5).  The court denies MedicAlert's motion to dismiss the tort claim on the basis of preemption.  (Docket Entry No. 24).  This case is set for a status conference on **April 24, 2017 at 3:00 p.m.**

SIGNED on March 16, 2017, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge